## BARBARINO v. STANHOPE S. S. CO., LIMITED, et al.

District Court, S. D. New York.

Oct. 20, 1944.

Paul C. Matthews, of New York City, for libellant.

Reid, Cunningham & Healy and Frederick H. Cunningham, all of New York City, for Stanhope S. S. Co.

E. C. Sherwood, of New York City, and Patrick J. McCann, of Brooklyn, N. Y., for Northern Dock Co.

RIFKIND, District Judge.

The action is by a longshoreman, an employee of a stevedoring company, against the owner of the S. S. Stangarth for injuries he sustained while employed aboard the vessel.

The facts are as follows: The Stangarth was a new vessel built in England in 1942. On February 22, 1942, she was berthed at a Brooklyn pier and being readied for her maiden voyage. On that day the owner's agents asked the longshoreman working upon the vessel to rig preventer guys upon all of the booms, a task usually performed by the ship's crew. In due course the booms serving hatches 1, 2, 3 and 4 were rigged—eight booms in all. Libellant was one of the gang doing this work. In rigging the port boom of No. 5 hatch, the men were distributed as follows: Elia was hatch boss, stationed near the winch and directing the operation; Buta was winchman; Zappola handled the loop of the preventer guy which he noosed over the nose of the boom and libellant held the slack end of the preventer guy and paid it out as required.

In the actual operation the winchman brought the boom to a point about one foot above the cradle designed to receive the boom when at rest and about two feet to the port side of the cradle. Zappola and libellant were atop the hatch. Zappola rigged the guy on the boom and stepped back. Libellant still holding the slack end of the guy likewise stepped back. The hatch boss gave the command to lift the boom. The boom rose about a foot, fell to the hatch cover striking and injuring the libellant.

The boom fell because of the breaking of a bolt which was intended to hold the messenger of the topping lift cable fast to the winch-drum. No direct testimony of the cause of the break is available since ship and crew were lost on the maiden voyage. The bolt was tapered in design, threaded at one end for about one-half its length to receive a nut and fitted with an eye at the other end to receive the end of the messenger. The bolt was intended to be passed through a hole in the lip of the nigger head. The nut was then supposed to be turned on to the bolt to make it secure; and this rigging was designed not to carry the weight of the boom but to hold the messenger to the drum which, when wound with two and a half turns of cable, holds the boom without substantial strain on the bolt.

Such a rigging when in good condition is suitable for its purpose provided the bolt is driven home through the hole in the nigger head and the eye of the bolt is kept close to the lip of the nigger head by

turning the nut of the bolt as far as it can go; otherwise the bolt will project some distance and the pull of the messenger will exert a lateral breaking force upon it. Such breaking force is likely to be exerted especially when the winch jerks, as it is apt to do when it is cold and the steam is condensed, or if it happens to come to rest at dead center. Both occurrences are frequent and to be expected. The rigging described represents a new practice. None of the longshoremen who testified had seen it before.

■ Either the bolt broke because it was defective or because it had not been inserted through the nigger head all the way to the bolt eye. The second alternative is eliminated by the testimony of Elia, the hatch boss, who testified that he had turned on the nut as far as it would go flush against the nigger head. True, his testimony is somewhat weakened by the fact that after first testifying that Buta turned on the nut he later said that he had done it himself as Buta had testified. Nevertheless I credit his statement. He gave every impression of telling the truth. The modification of his first statement was volunteered although it was against his self-interest to accept responsibility for this step in the operation. Elia's testimony that he had made the nut tight was uncontradicted; and while one can never be certain that he knows the truth on an issue of this kind, I am less troubled by this residue of doubt because I think that, since the device was new and dangerous unless used in the mode described, it was the duty of the respondent to make sure that the longshoremen were aware of the necessary caution before entrusting the device to their use. This is especially true since customary rigs, such as hooks or clamps, required no such close attention.

There is no evidence at all to support the allegation of respondent that the employees of the stevedoring company, the impleaded respondent, were negligent in the manner they handled the topping lift chain; and I decide against the contention of the respondent that the stevedores should have rigged the preventer guys while the boom was at rest in its cradle or while it was lifted directly above the cradle. While I cannot, on the evidence, say that it was impossible to accomplish the task in one or the other of the two ways suggested, it was manifestly inconvenient to do it that way; nor was it the customary way. True, had the boom been rigged in the manner now suggested by respondent the injury would not have happened but that is not the test of respondent's liability. It certainly would make work on board ship move with intolerable sluggishness if every laborer proceeded in the expectation that every suspended boom was in danger of falling.

■ I conclude that the impleaded respondent is free of fault; that the respondent is wholly responsible for libellant's injuries whose damages I assess at $12,000.